**ALPHAMED PHARMACEUTICALS CORP., Plaintiff,**

v.

**ARRIVA PHARMACEUTICALS, INC. f/k/a Alphaone Pharmaceuticals, Inc., et al., Defendants.**

No. 03–20078–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Filed Jan. 14, 2003.

Jan. 5, 2005.

**1152**

James Edward McDonald, Lida Rodriguez–Taseff, Michelle Gervais–Kullman, Duane Morris, Miami, FL, for Alphamed Pharmaceuticals Corp., plaintiff.

Eric Saida, Baker & McKenzie, Miami, FL, James Edward McDonald, Lida Rodriguez–Taseff, (See above), for John, Jarrett, Noreen and Darren Lezdey, plaintiff.

Steven Wayne Marcus, Ruden McClosky Smith Schuster & Russell, Fort Lauderdale, FL, Jay Barry Green, Green Ackeerman & Frost, Boca, FL, Jonathan Goodman, Julie Elizabeth Nevins, Akerman Senterfitt, Miami, FL, Paul Joseph Riley, IV, Jason A. Crotty, Morrison & Foerster, San Francisco, CA, Dale Lyn Friedman, Conroy Simberg Ganon Krevans & Abel, Hollywood, FL, David Reich Chase, Penthouse, David R. Chase, Hollywood, FL, Frank Herrera, Miami, FL, for Arriva Pharmaceuticals, Inc., a California Corporation fka AlphaOne Pharmaceuticals, Inc., defendant.

Jay Barry Green, (See above), Jeffrey David Feldman, Steven Eric Eisenberg, Feldman Gale, Miami, FL, for Spinelli Corporation, an Arizona corporation, defendant.

Jay Barry Green, (See above), Ilana K. Green, Green Ackeerman & Frost, Boca, FL, Ilana K. Green, Akerman Senterfitt, Miami, FL, for CTG & Associates LLC, a Georgia limited liability company and, defendant.

Jay Barry Green, Ilana K. Green, (See above), for Norman Transeth, an individual, defendant.

Eric Saida, Baker & McKenzie, Miami, FL, James Edward McDonald, Duane Morris, Miami, FL, Douglas J. Rovens, Zelle Hoffmann Voebel Mason & Gette, Los Angeles, CA, for John Lezdey, defendant.

---

1. All paragraph references are to the TAC.

*ORDER ON MOTION TO DISMISS*

ALTONAGA, District Judge.

THIS CAUSE came before the Court upon Defendant, Arriva Pharmaceuticals, Inc.'s ("Arriva") Motion to Dismiss the Second Amended Complaint (**D.E.289**), filed on September 10, 2004. The Court has reviewed the written submissions of the parties, the relevant portions of the record, and applicable law, and heard oral argument on December 17, 2004.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following allegations are contained in the Third Amended Complaint ("TAC"). This case arises out of competition in the pharmaceutical industry between Plaintiff, AlphaMed Pharmaceuticals Corp. ("AlphaMed") and Arriva. AlphaMed is a biotechnology engineering and manufacturing firm, which is involved in the development and production of Alpha 1–Antitrypsin ("AAT"), a therapeutic protein produced naturally by the liver, which is released into the blood stream to protect tissue cells from damage caused by enzymes produced as the result of infection or inflammation within the body (¶¶ 12, 18).[1] AAT is extremely useful for treating a wide range of human and veterinary indications, and pharmaceutical companies all over the world have undertaken significant research efforts to develop a method for the mass production of bio-synthetic AAT (¶ 12). Currently, the Federal Food and Drug Administration (the "FDA") has approved only one method for the mass production of AAT (¶ 13). This method derives AAT from blood plasma (¶ 13). Bayer Pharmaceuticals Corporation manufactures the only drug on the market that uses blood derived AAT, and that drug (Prolastin) has

been approved by the FDA only for the treatment of hereditary emphysema (¶ 14).

On or about October 26, 2001, AlphaMed filed a patent application for a patent in the United States and abroad to cover a method for the mass production of glycosylated[2] AAT, derived from *Pichia pastoris* yeast cells (¶ 21). The pending patent application has been assigned U.S. Serial No. 09/981,073 (¶ 21). More important to this case, by assignment dated April 10, 2001 from J & D Sciences, Inc., AlphaMed is the owner of U.S. Patent No. 6,174,859 (the " '859 patent"), which covers the treatment of eye and ear infections (including otitis media and otitis externa in humans or animals) through the application of AAT and/or secretory leucocyte protease inhibitor ("SLPI") (¶ 23).[3] No other entity is permitted to make, use, sell, offer to sell, or import into the United States the technology claimed in the '859 patent without the permission and/or express authorization of AlphaMed (¶ 24).

Arriva is also a biopharmaceutical company, and its main corporate mission at the time of its creation was to develop a genetically engineered version of the drug Prolastin for use in pulmonary and topical applications (¶ 25). Arriva currently claims to focus on the development and commercialization of recombinant protease inhibitors for treatment of a wide range of human diseases, including eye and ear infections (¶ 26). Arriva has raised millions of dollars for research and clinical trials designed to put it in a position to exploit the worldwide market for AAT (¶ 27).

AlphaMed claims that Arriva has engaged in corporate espionage against AlphaMed in an attempt to develop the intellectual property necessary for exploitation of the market for AAT, including obtaining AlphaMed's trade secrets (¶¶ 28–29; 41–53; 110–121).[4]

In September 1999, Arriva sought to have AlphaMed investigated by the FBI, and used a private investigation firm, Defendant, Spinelli Corporation ("Spinelli"), to try to convince the FBI to seek criminal charges against AlphaMed and its principals (¶ 29). Among other statements, Arriva and Spinelli told the FBI that Arriva was the owner of the specific DNA genetic source code for manufacturing AAT (¶ 30). The FBI ultimately did not file criminal charges against AlphaMed, but Arriva used the investigation to cause substantial financial damage to AlphaMed (¶ 31). Among that damage was a business relationship with Robert Williams ("Williams"), AlphaMed's chief investor (¶ 124). Williams had invested more than $1 million in AlphaMed and was preparing to invest another $1 million before Arriva allegedly disrupted the financial relationship (¶ 124). Just as AlphaMed and Williams were in the process of finalizing an agreement for additional financing in late March 2001, an agent of Arriva's called Williams and stated that he was investigating a complaint made by "members of the Wachter family [Dr. Alan Wachter was the medical director of Arriva] against the Lezdey family [the principals of AlphaMed]" (¶ 126). Because this

2. The term "glycosylated" refers to the presence of mannose or sugar groups in the AAT molecules. This characteristic is significant because the presence of mannose or sugar groups in the AAT molecules decreases the likelihood that the foreign AAT will be rejected by the human body.

3. Arriva claims the '859 was fraudulently transferred to AlphaMed, but for purposes of this Motion, the Court does not consider that claim.

4. The allegations of corporate espionage are the most contentious in this case and formed the basis of two RICO counts that were included in the Second Amended Complaint but are not in the TAC. Most of these allegations are not directly relevant to the present Motion.

agent continued to call him and purport to be an FBI agent, Williams decided not to make any more investments in AlphaMed (¶ 128).

In 2001, Arriva claimed it had developed technology for the large-scale production of stable, non-animal sourced recombinant proteins through the use of *Saccharomyces cerevisiae*, another type of genetically engineered yeast cell (¶ 32). This claim was false because ZymoGenetics, Inc. had already received a patent for the production of AAT using *Saccharomyces cerevisiae* yeast cells (U.S. Patent No. 5,218,091) (the " '091 patent") (¶ 33). Arriva obtained a license from ZymoGenetics, Inc. ("ZymoGenetics") to commercially exploit the '091 patent in June 2002 (¶ 33). The AAT produced through this method is not glycosylated, as compared to the method of producing AAT through *Pichia pastoris* yeast cells (¶ 34).

According to the TAC, on multiple occasions, Arriva has falsely represented that it has exclusive rights in and/or ownership of the '859 patent, including the ability to make, sell, or use AAT to treat eye or ear infections (including otitis media and otitis externa, in humans or in animals) to investors, customers, and/or users of AlphaMed's AAT technology as claimed in the '859 patent (¶ 57). Additionally, in or about April 2000, Arriva began a collaboration with the University of Florida relating to preclinical research studies associated with AAT (¶ 65). In or about June 2001, Arriva and the University of Florida expanded their collaboration to cover ex-vivo and animal otitis studies using recombinant AAT and SLPI (¶ 65). As part of that collaboration, the University of Florida is receiving funding and/or working with and/or acting on behalf of Arriva in performing acts that are within the scope of the claims in the '859 patent, including the administration of AAT and SLPI to animals and/or humans afflicted with otitis media (¶ 66). In July 2002, the University of Florida created a budget for these clinical trials and prepared a consent form to be signed by human subjects (¶ 66). According to the TAC, these activities indicate a clear intent to commercialize AAT and SLPI derived pharmaceuticals for the treatment of otitis media or otitis externa upon the receipt of regulatory authorization (¶ 68) and are either active infringement of the '859 or an intent to infringe the '859 patent in the future (¶ 70). The TAC also alleges that Arriva will engage in inevitable future acts, such as stockpiling AAT derived pharmaceuticals and further marketing AAT derived pharmaceuticals for otitis media (¶ 72).

Starting some time prior to January 2003, Arriva put out a series of advertisements on its internet web site, which, according to the TAC, convey a false impression that Arriva has the legal right to commercialize AAT for the treatment of inflammatory ear diseases (¶ 83). In its "Company Profile" webpage of its internet website dated January 13, 2003, Arriva stated that it is a privately held company focused on "the development and commercialization of recombinant protease inhibitors for treatment of a wide range of human diseases." According to the webpage, Arriva's areas of therapeutic focus are, among others, inflammatory ear diseases (¶ 84). In further describing its therapeutic focus in the area of inflammatory ear diseases in its "Inflammatory Ear Diseases" webpage, Arriva states: "Scientists at Arriva, in collaboration with investigators at the University of Florida, are investigating the use of AAT in treating the inflammation seen in childhood and adult ear infections. Otitis media, inflammation of the middle ear, is the most common disease of childhood." (¶ 85).

Starting some time prior to 2001, Arriva prepared and disseminated a series of

business summaries and business overviews, which it distributed to potential investors and potential business and venture partners (¶ 97). In one such summary, Arriva stated in a graph that its timeline to conduct clinical trials for use of AAT to treat otitis media was the end of 2001, and that its "FDA Approval Window" for obtaining FDA approval for a drug to treat otitis media using AAT was between 2003 and 2004 (¶ 98). In various drafts of its business overview titled "Protease inhibitor therapeutics for the treatment of inflammatory ear disease," Arriva provides an entire analysis of its therapeutic focus in the area of inflammatory ear disease. In all drafts, Arriva states that its goal is to receive FDA and worldwide approval "for the use of recombinant AAT in the treatment of otitis media and otitis externa." (¶ 99). According to the TAC, these business summaries and overviews convey a false or misleading impression that Arriva has the legal right to commercialize AAT for the treatment of inflammatory ear diseases (¶ 100).

AlphaMed filed the Complaint in this case on January 14, 2003, an Amended Complaint on February 6, 2004, and a Second Amended Complaint on July 26, 2004. Arriva filed the present Motion to Dismiss on September 10, 2004, but AlphaMed filed the TAC, with leave of the Court, on December 17, 2004. The TAC eliminates two counts against Arriva but makes no substantive changes to the remaining allegations against Arriva. Therefore, although Arriva's Motion addresses the Second Amended Complaint, the Court considers the arguments contained in it with respect to the TAC.

In the TAC, AlphaMed alleges seven counts against Arriva: (1) declaratory judgment as to ownership of the '859 pat-

ent; (2) declaratory judgment as to infringement of the '859 patent; (3) false advertising relating to Arriva's website; (4) false advertising relating to Arriva's business plans and offering materials; (5) misappropriation of trade secrets; (6) tortious interference with advantageous business relationships; and (7) common law unfair competition. Arriva moves to dismiss all claims except Count 5, misappropriation of trade secrets.[5]

## II. LEGAL ANALYSIS

### A. The Standard on a Motion to Dismiss

For purposes of a motion to dismiss, the court must accept the allegations of the complaint as true. *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir.1999) (en banc). Moreover, the complaint must be viewed in the light most favorable to the plaintiff. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F.2d 948, 953 (11th Cir.1986). To warrant a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Nonetheless, to survive a motion to dismiss, a plaintiff must do more than merely label his or her claims. *Blumel v. Mylander*, 919 F.Supp. 423, 425 (M.D.Fla.1996). Thus, dismissal of a complaint or a portion thereof is appropriate when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171,

---

**5.** In its Motion to Dismiss, Arriva moves to dismiss this count as it pertains to documents it alleges are not trade secrets and are not related to AAT. Because the TAC eliminate references to those documents, the Court does not consider this argument.

1174 (11th Cir.1993). In deciding a motion to dismiss, a court may only examine the "four corners" of the complaint and any matters incorporated therein, and not matters outside the complaint, without converting the motion to dismiss into a motion for summary judgment. *See Crowell v. Morgan Stanley Dean Witter Servs., Co., Inc.,* 87 F.Supp.2d 1287, 1290 (S.D.Fla. 2000); *Blount v. Sterling Healthcare Group, Inc.,* 934 F.Supp. 1365, 1368 (S.D.Fla.1996).

### B. *AlphaMed has not stated a claim for declaratory relief for patent infringement in Counts I and II.*

■ In Count I, AlphaMed seeks a declaration, pursuant to the Declaratory Judgment Act, that it is the owner of the '859 patent. In Count II, AlphaMed seeks a declaration that Arriva is currently and/or will imminently infringe on the '859 patent. Count I is duplicative of Count II because in order to take legal action for patent infringement, a plaintiff needs to have an ownership interest in that patent. In fact, in Count II's prayer for relief, among other things, AlphaMed seeks a declaration that "AlphaMed is the sole owner of the '859 Patent. . . ." *TAC,* p. 21. That is the same relief requested in Count I. Therefore, for purposes of the present Motion, the Court considers Counts I and II together.

■ The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, in relevant part:

(a) In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final

judgment or decree and shall be reviewable as such.

"[T]he operation of the Declaratory Judgment Act is procedural only." *Household Bank v. JFS Group,* 320 F.3d 1249, 1253 (11th Cir.2003) (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). If there is an underlying ground for federal court jurisdiction, the Declaratory Judgment Act "allow[s] parties to precipitate suits that otherwise might need to wait for the declaratory relief defendant to bring a coercive action." *Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464, 1467 (11th Cir.1987). "The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act." *Lang v. Pacific Marine and Supply Co., Ltd.,* 895 F.2d 761, 764 (Fed.Cir.1990) (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735 (Fed.Cir.1988)).

■ Declaratory judgment actions in the patent area are most commonly brought by potential infringers against patentees seeking a declaration of noninfringement or invalidity or both. *Lang,* 895 at 763 (citing 10A WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. § 6761). Declarations of infringement sought by patentees against parties who will allegedly infringe in the future have been less frequently requested but have been allowed. *Id.* (citations omitted). To meet the controversy requirement in a declaratory judgment suit by a patentee against an alleged future infringer, two elements must be present: (1) the defendant must be engaged in an activity directed toward making, selling, or using the patented item subject to an infringement charge under 35 U.S.C. § 271(a), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face

of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming. *Id.* Even assuming an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary. *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 634 (Fed.Cir.1991).

■ The TAC alleges that Arriva has falsely represented that it has exclusive rights in and/or ownership of the '859 patent by representing on its website that "AAT is currently being formulated for its use to treat [otitis media]" (¶ 58), and asserting in answers to interrogatories in this case that "[o]n information and belief, Arriva has rights, title and/or interest in [the '859 patent]" (¶ 59). AlphaMed alleges that Arriva has infringed on the '859 patent by taking the following actions: (1) collaborating with the University of Florida with respect to preclinical research studies associated with AAT (¶ 65); (2) collaborating with the University of Florida on *ex-vivo* and animal otitis studies using recombinant AAT and SLPI (¶ 65); (3) performing clinical trials with AAT and SLPI on animals and/or humans (¶ 66); and (4) publishing research plans, which "indicate a clear intent to commercialize AAT and SLPI derived pharmaceuticals for the treatment of otitis media or otitis externa, upon the receipt of regulatory authorization" (¶ 68).

Arriva advances two key arguments in the Motion to Dismiss: (1) AlphaMed has not alleged any specific acts that Arriva has taken that indicate either present infringement or imminent future infringement sufficient to warrant declaratory relief; and (2) all of the acts Arriva has taken with respect to its collaboration with the University of Florida are, as a matter of law, non-infringing.

Arriva relies heavily on *Lang,* 895 F.2d 761, to bolster its first argument that there is not an imminent threat of infringement.

The plaintiff in *Lang* held patents for several features of a ship's hull and sued for a declaration of future infringement, alleging that the defendants were in the process of manufacturing a hull that, when finished, would infringe on his patents. *Lang,* 895 F.2d at 763. The Federal Circuit held that it lacked subject matter jurisdiction over the claim because the defendants were nine months away from completing the allegedly infringing hull at the time the declaratory judgment action had been filed and had not distributed sales literature or solicited orders for the allegedly infringing hull. *Id.* at 764. Therefore, the plaintiff had not demonstrated a substantial controversy of sufficient immediacy to warrant the court's jurisdiction. *Id.* at 764–65.

According to Arriva, the present case is similar to *Lang* because even if the allegations of the TAC are true, AlphaMed has not alleged that Arriva has a pharmaceutical product or that Arriva is selling an imminent pharmaceutical product. "Without certainty of FDA approval, which AlphaMed cannot allege, Arriva's commercialization activities are not imminent." *Motion to Dismiss,* p. 14; *see also Abbott Laboratories v. Zenith Laboratories,* 934 F.Supp. 925, 938 (N.D.Ill.1995) (FDA approval in three months was not imminent enough to warrant declaratory relief).

AlphaMed argues that *Lang* is inapplicable because Arriva has done more than the defendant did in *Lang.* According to AlphaMed, Arriva has also advertised to investors, through its website, that it has exclusive rights to make AAT to treat eye and ear infections. However, in the TAC, the only specific factual allegation that comes close to such a claim is that Arriva has stated that "AAT is currently being formulated for its use to treat [otitis media]" (¶ 58). And While Arriva also has declared, through discovery requests, that

it may have ownership rights to the '859 patent (¶ 57), there are no allegations that Arriva has advertised to anyone that it has exclusive rights to AAT-derived pharmaceuticals other than the blanket allegation that "[o]n multiple occasions ... Arriva has falsely represented that it has exclusive rights in and/or ownership of the '859 Patent...." (¶ 57). Additionally, the TAC acknowledges that Arriva has a license from ZymoGenetics to produce AAT using *Pichia pastoris* yeast cells (¶ 33), but AlphaMed does not distinguish between statements made by Arriva relating to the license from ZymoGenetics, which Arriva does have a license to use, and statements relating to the '859 patent.

AlphaMed additionally argues that *Lang* is inapplicable because it did not deal with the pharmaceutical industry or FDA approval. However, AlphaMed uses another non-pharmaceutical case to bolster its argument. In that case, a court allowed a declaratory action for patent infringement when the defendant had advertised the new product (a microcomputer chip) but had not yet sold or manufactured it. *Automation Systems, Inc. v. Intel Corp.*, 501 F.Supp. 345, 346 (D.Iowa 1980). The court noted that the plaintiff had alleged that the product in question had been widely distributed, samples would soon be available and orders soon solicited. *Id* at 348.

Unlike the plaintiff in *Automation Systems,* AlphaMed has not alleged that Arriva has advertised any infringing product. According to AlphaMed, Arriva has only advertised, on its website, that AAT is currently being formulated to treat otitis media. It is not alleged that Arriva has sold or manufactured anything, nor that Arriva has prepared to sell or manufacture anything. In other words, AlphaMed has not identified an infringing product.

In another case considered by the Federal Circuit dealing with medical devices, the district court declined to exercise jurisdiction over a declaratory judgment action, and the Federal Circuit affirmed, because the defendant, at the time of the suit, had only recently begun clinical trials and was years away from potential FDA approval. *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed.Cir. 1992). Similarly, Arriva has engaged in clinical trials and collaboration with the University of Florida, but AlphaMed has not alleged that Arriva has sought FDA approval for any particular drug. In fact, AlphaMed has not even alleged that Arriva has developed any drug that *could* gain FDA approval. The TAC contains only generalized allegations that Arriva would like to bring to market, at some unspecified time, an AAT-derived pharmaceutical, without specifying what the product is, when FDA approval will be sought, or whether or not the hypothetical pharmaceutical will be produced through Arriva's license with ZymoGenetics.

■ Arriva's second argument relies on a statutory provision that allows a "safe harbor" against patent infringement:

It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

35 U.S.C. § 271(e)(1). This provision ensures that a patentee's rights do not *de facto* extend past the expiration of the patent term because a generic competitor also could not enter the market without regulatory approval. *Integra Lifesciences v. Merck KGaA*, 331 F.3d 860, 865 (Fed. Cir.2003).

■ Section 271(e)(1) benefits competitors of the patent holder by freeing them from liability for development work rea-

sonably related to securing regulatory approval. By enabling testing to comply with regulatory processes before patent expiration, this section allows competitors to enter the market more quickly after a patent expires, thus limiting what would otherwise amount to an extension of the patent term. *See Glaxo Inc. v. Novopharm Ltd.*, 110 F.3d 1562, 1568 (Fed.Cir. 1997). The safe harbor permits "premarket approval activity conducted for the sole purpose of sales after patent expiration." *Hoechst–Roussel Pharms., Inc. v. Lehman*, 109 F.3d 756, 763 (Fed.Cir.1997). For example, clinical trials and demonstrations of medical devices are allowed, *Integra Lifesciences*, 331 F.3d at 865, as is conduct collateral to clinical trials, such as the reporting of preclinical trial progress to investors, analysts, and journalists. *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1523 (Fed.Cir. 1992).

However, the safe harbor does not "reach any exploratory research that may rationally form only a predicate for future FDA clinical tests." *Integra Lifesciences*, 331 F.3d at 867. "Extending § 271(e)(1) to embrace all aspects of new drug development activities would ignore its language and context with respect to the 1984 Act [which granted the safe harbor] in an attempt to exonerate infringing uses only potentially related to information for FDA approval. Moreover, such an extension would not confine the scope of § 271(e)(1) to *de minimis* encroachment on the rights of the patentee." *Id.*

In *Integra*, the defendants' allegedly infringing experiments did not supply information for submission to the FDA but instead identified the best drug candidate to subject to future clinical testing under the FDA processes. *Integra*, 331 F.3d at 867. The defendants' experiments were general biomedical research which identified new pharmaceutical compounds lead-ing to new drug candidates. Although the *Integra* court only considered clinical research conducted to identify potential new drug candidates, the court established the outer limits of the safe harbor provision. The court clarified that infringing activity would only be allowed if it was reasonably related to FDA approval of a current drug. *Id.*

AlphaMed has not alleged that any of the activities Arriva has taken constitute research to identify new drugs that may be subject to FDA approval. Rather, the TAC only contains allegations that Arriva has been conducting clinical trials relating to AAT for use in ear infections, precisely the kind of research that the safe harbor provision protects.

In an attempt to bolster its argument that this case is like *Integra*, AlphaMed states in its response to the Motion to Dismiss:

> [t]o the extent that the University of Florida and Arriva are investigating compositions that would require separate FDA applications (e.g., compositions with and without SLPI or compositions with other significant differences), under the *Integra* case, they are deemed to be outside the scope of the § 271(e)(1) exception, in that they are not simply developing data useful for FDA approval of a drug compound, but are instead trying to discover an appropriate drug composition for which such data can be developed in the future.

*Response*, p. 7. However, there are no allegations in the TAC that the collaboration between Arriva and the University of Florida has consisted of research into new compositions that would lead to new drugs or FDA approval for different drugs. Rather, AlphaMed has only alleged that Arriva has been conducting pre-clinical trial research and clinical trials relating to AAT and the treatment of ear infections.

AlphaMed *does* allege that the present activities of Arriva will lead to "inevitable commercialization activities," but AlphaMed does not allege with any specificity what these activities are and whether they are imminent.

Lastly, AlphaMed argues that "[o]nce regulatory approval has been granted, the exception created by 35 U.S.C. § 271(e)(1) will no longer protect the activities of Arriva...." (¶ 73). AlphaMed thus seems to concede that the current activities of Arriva are protected by the safe harbor provision, and that future activities, which are not defined, will not be. AlphaMed has made only conclusory allegations that Arriva will inevitably participate in non-exempt infringing acts prior to obtaining regulatory approval, such as stockpiling AAT pharmaceuticals. AlphaMed's allegations are purely speculative; AlphaMed has failed to allege any facts demonstrating that this "inevitable" conduct is real and imminent.[6] Therefore, AlphaMed has not stated a claim under the Declaratory Judgment Act for present or future infringement.

### C. *AlphaMed has not stated claims for false advertising in Counts III and IV.*

In Count III, AlphaMed alleges that Arriva has violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) by placing a series of false or misleading advertisements on its internet web site. These advertisements, according to AlphaMed, are literally true or ambiguous but misleading because they convey a false impression that Arriva has the legal right to commercialize AAT for the treatment of inflammatory ear diseases (¶ 83). On its "Company Profile" webpage, Arriva stated that it is a privately held company focused on "the development and commercialization of recombinant protease inhibitors for treatment of a wide range of human diseases," including inflammatory ear diseases (¶ 84). In its "Inflammatory Ear Diseases" webpage, Arriva stated that "Scientists at Arriva, in collaboration with investigators at the University of Florida, are investigating the use of AAT in treating the inflammation seen in childhood and adult ear infections" (¶ 85).

In Count IV, AlphaMed alleges that Arriva has violated the Lanham Act by disseminating a series of misleading advertisements in the form of "business summaries" and "business overviews" to potential investors and business and venture partners (¶ 97). In one business summary, Arriva stated in a timeline graph that its timeline to conduct clinical trials for the use of AAT to treat otitis media was the end of 2001 and that its "FDA Approval Window" for obtaining FDA approval of a drug to treat otitis media using AAT was between 2003 and 2004 (¶ 98). In various drafts of its business overview titled "Protease inhibitor therapeutics for the treatment of inflammatory ear disease," Arriva provides an entire analysis of its therapeutic focus in the area of inflammatory ear disease. In every draft, Arriva states that its goal is to receive FDA and worldwide approval "for the use of recombinant AAT in the treatment of otitis media and otitis externa" (¶ 99).

 Section 43(a) of the Lanham Act provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or

---

**6.** At oral argument, counsel for AlphaMed stated that the safe harbor provision could be used as an affirmative defense, but it could not be a ground to dismiss the TAC. However, from the face of the TAC, the Court is able to determine that the complained-of activities are protected by the safe harbor provision, as a matter of law.

any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To state a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must allege: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been, or is likely to be, injured as a result of the false advertising. *Hickson Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1260 (11th Cir.2004) (citations omitted). The first element of the Lanham Act test requires that the plaintiff show that the statements at issue were either "(1) commercial claims that are literally false as a factual matter" or "(2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* at 1261 (quoting *United Industries Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir.1998)).

AlphaMed has alleged: (1) Arriva's statements on its website and business plans are misleading (¶¶ 83; 97); (2) Arriva's statements had the capacity to deceive future investors in AlphaMed and Arriva (¶¶ 86; 100); (3) Arriva's deceptive statements materially affected investors in AlphaMed (¶¶ 90; 104); (4) the statements and the underlying claims affected interstate commerce (¶¶ 81; 105); and (5) AlphaMed has been injured and will be fur-

ther injured in the future as a result of Arriva's misleading statements (¶¶ 92; 106).

Arriva challenges the sufficiency of these allegations on three grounds. First, Arriva argues that AlphaMed lacks standing to make a Lanham Act false advertising claim because AlphaMed does not have a present or imminent AAT drug on the market, making its claims hypothetical. Second, Arriva argues that AlphaMed's false advertising claims are not premised on false or misleading representations in connection with any goods or services because neither AlphaMed nor Arriva has an actual AAT pharmaceutical product on the market. Finally, Arriva argues that its representations on its website and business plans are actually true and not misleading because they do not convey an impression that Arriva has a patent, a patent application, or a license to use AAT to treat inflammatory ear diseases.

 The Third Circuit has developed a test for determining whether a plaintiff has standing to bring a false advertising claim under the Lanham Act. *Conte Bros. Auto., Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221 (3d Cir.1998). In that case, the plaintiffs were "a putative nationwide class of retail sellers of motor oil and other engine lubricants that purportedly compete[d] with Slick 50, a Teflon-based engine lubricant manufactured by [defendants]," *Id.* at 223–24. In other words, whereas the defendants manufactured engine lubricant, the plaintiffs sold the same type of product, though not the defendants' brand. The retailers alleged that the defendants "falsely advertised that the addition of Slick 50 would reduce the friction of moving parts, decrease engine wear, and improve engine performance efficiency." *Id.* at 224.

 The Third Circuit began its standing analysis by recognizing that at the

time "there exist[ed] no single overarching test for determining the standing to sue" under § 43(a). *Id.* According to the Third Circuit, in order to determine whether a plaintiff has standing to assert a false advertising claim under the Lanham Act, the court considers: (1) whether the injury alleged is "of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]"; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages. *Conte Bros.*, 165 F.3d at 233 (citing *Associated Gen. Contractors*, 459 U.S. at 538–44, 103 S.Ct. 897).

■■■ As to the first factor (whether the plaintiff's asserted injury is "of a type the Congress sought to redress"), the Lanham Act has two aims: (1) vindicating " 'commercial interests [that] have been harmed by a competitor's false advertising"; and (2) " 'secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.' " *Id.* at 234 (citations omitted). The Third Circuit found that the rectification of the injury asserted by the plaintiff class furthered neither of these purposes. *Id.* Although the harm asserted by the retailers was commercial, it was not competitive in nature. The retailers asserted that the defendants' misrepresentations resulted in pecuniary losses for their business enterprises (thereby rendering the injury commercial), but they did not contend that they incurred such losses because those representations impugned them as vendors of engine additive or, conversely, touted the virtues of any competing retailer. *Id.*

In the present case, AlphaMed has alleged that it is a competitor of Arriva and that its commercial interests will be harmed by Arriva's alleged false advertising. Arriva argues, however, that AlphaMed has not alleged that either AlphaMed or Arriva has an AAT-derived pharmaceutical on the market or will imminently have one on the market. Therefore, according to Arriva, AlphaMed's alleged injury is not of the type of competitive injury Congress sought to address.

To bolster its standing argument, Arriva heavily relies on a Second Circuit case with similar facts. In *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir.1997), a retailer of weight loss products brought a declaratory judgment action against a patentee of a method for inducing weight loss by administering a combination of ephedrine, caffeine, and aspirin ("ECA"), seeking a declaration that the patentee did not have standing to sue under Lanham Act's false advertising provision. *PDK*, 103 F.3d at 1107. The patentee was not selling an ECA weight loss product to the public at the time of the alleged injury. Rather, he was marketing his product to potential investors to raise funds needed to commercialize an ECA weight loss product and to obtain FDA approval. *Id.* The Second Circuit held that the patentee had no standing to sue because he "does not currently sell a retail weight loss product that competes with [the retailer's] products." *Id.* at 1112. "Although a future 'potential for a commercial or competitive injury' can establish standing ... Friedlander's [the patentee's] hopes of eventually obtaining FDA approval and selling a retail weight loss product are too remote at this stage to confer standing to challenge [the retailer's] advertising.' " *Id.* (citations omitted).

Like the patentee in *PDK*, AlphaMed has alleged that it holds a patent but it has not alleged that it has an imminent AAT product for eye and ear infections,

nor has it alleged that it has sought FDA approval of any product. AlphaMed attempts to distinguish *PDK* by pointing out that the patentee in that case was unable to assert that he was a competitor of the retailer *only* because the retailer entered the market without obtaining FDA approval for its product. In the present case, both Arriva and AlphaMed *have* asserted that they are competitors of each other, each attempting to bring to market an AAT-derived pharmaceutical for the treatment of ear infections before the other. Therefore, according to AlphaMed "[i]t would be incongruous for Arriva to now try to argue that the two companies are not competitors after all." *Response*, p. 8. However, AlphaMed has not alleged that it has a specific product that competes with a product of Arriva's. Like the patentee in *PDK*, it only has a speculative product, and it is only alleging injury through loss of investors, not consumers.

AlphaMed cites other cases in its response for the proposition that if Arriva and AlphaMed are considered competitors in general, then the absence of a competing product on the market or about to be on the market is immaterial. Arriva correctly points out that in both cases cited by AlphaMed, the parties were selling actual products that competed, even if the specific products in question were not directly competing. In *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980), the parties were selling actual products that competed in the hair removal market, Nair and Baby Oil, and not simply speculative products. Although Nair and Baby Oil were not competitive products in the specific depilatory market, the goods competed in the general hair removal market. In *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir.1997), the NBA did not have a product on the market in competition with Motorola's product, a pager providing real-time sporting event information. Therefore, the court dismissed the NBA's claim for false advertising.

In this case, AlphaMed has not alleged that either party actually has an AAT-derived pharmaceutical product currently on the market; according to the TAC, both parties are attempting to bring to market such products. The TAC does not focus on consumer confusion due to the alleged false advertising. Instead, the allegations deal with *investor* confusion, namely, that Arriva's representations on its website and in its business plans create the false impression that it has a patent similar to the '859 patent. AlphaMed, as the holder of the patent, complaints of false advertising which affects investment in its company, which holds the '859 patent. AlphaMed and Arriva compete in the market for investors, who will allow each to bring to market an AAT-derived pharmaceutical for the treatment of ear infections. However, because no allegation of *consumer* confusion has been made, nor could it, since there is no product alleged to exist on the market, AlphaMed has no standing to sue under the Lanham Act's false advertising provision. *See Telecom Intern. America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir.2001) ("Because AT & T's alleged misrepresentations were made in its role as an equipment and service provider to a reseller, rather than in its later-acquired role of a call-turnaround provider to ultimate consumers, AT & T and TIA were not competitors when the alleged false statements were made."); *see also PDK*, 103 F.3d at 1112.

In fact, like the patentee in *PDK*, AlphaMed has not alleged that it has *any* products on the market. AlphaMed is alleging that it is marketing its future AAT product to potential investors so that it can raise funds needed to continue research and receive FDA approval. AlphaMed is in the same position as the patentee in

*PDK* and does not have standing under the Lanham Act.

■ Arriva's second argument, that AlphaMed's claims are defective because they are not premised on false or misleading representations in connection with any goods or services, is related to the standing argument. According to Arriva, because *Arriva* does not have an AAT-derived pharmaceutical product on the market for the treatment of ear and eye infections, the statements it made on its website and on business plans cannot be connected to any "goods or services." *See* 15 U.S.C. § 1125(a)(1)(B). AlphaMed counters that the phrase "goods or services" in the Lanham Act is meant to limit claims to misleading advertising involving commercial speech. While neither Arriva nor AlphaMed has a product in the market yet, Arriva is promoting AAT-related services in developing such a product, which is commercial speech.

Although the Eleventh Circuit has not articulated a test to determine whether misrepresentations constitute "commercial advertising or promotion" within the meaning of the Lanham Act, other circuits have:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379 (5th Cir.1996) (adopting the test set forth in *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics,* 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994)). This test has been adopted by several circuit courts of appeals and district courts. *See Proctor & Gamble, Co. v. Haugen,* 222 F.3d 1262, 1273–74 (10th Cir.2000); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999); *but cf. Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 58 (2d Cir.2002)(adopting the first, third and fourth elements of the *Gordon & Breach* test, but declining to express an opinion on whether misrepresentations in "commercial advertising and promotion" must be made by a defendant in commercial competition with the plaintiff). The *Seven–Up* court concluded that, "[w]e find this summary of the requirements for establishing 'commercial advertising or promotion' under § 43(a) of the Lanham Act both accurate and sound." *Seven–Up,* 86 F.3d at 1384.

The alleged speech is commercial speech, and AlphaMed alleges that Arriva is its competitor. Therefore, the first two prongs of the *Gordon & Breach* test are satisfied. The speech, however, was not made to influence consumers to purchase products of Arriva. As previously stated, neither party has an AAT-derived pharmaceutical on the market, and no consumers are involved with the allegations made in the TAC. The alleged speech was not made to a purchasing public. Therefore, all the allegations show is that the statements are in connection with *potential* goods and relate to commercial speech, but because there is no product at issue, they are not related to "goods and services" as defined by the Lanham Act and articulated by the *Gordon & Breach* test.

At oral argument, counsel for AlphaMed stated that Arriva and AlphaMed compete with regard to commercial activities, which

counsel claimed is a category of activity encompassed by the statute. However, the text of the statute is clear: a defendant is liable when it engages in activities that are "on or in connection with any goods or services." 15 U.S.C. § 1125(a)(1). The "commercial activities" to which counsel refers are, presumably, the "commercial advertising" and "promotion" in which a defendant might engage. 15 U.S.C. § 1125(a)(1)(B). In other words, a defendant might engage in commercial activities that subject it to liability, but those commercial activities must be in connection with goods or services. AlphaMed has alleged that Arriva and AlphaMed are competitors with respect to generalized commercial activities. To have standing for a false advertising claim under the Lanham Act, however, a plaintiff must allege more: a plaintiff must allege that the suspect commercial activities were related to some specific good or service, and AlphaMed has not done that.

 Arriva's final argument centers on the purported truth of the statements made. However, AlphaMed has not claimed that the statements are literally false; instead, AlphaMed alleges that they are misleading. A false advertising claim may be maintained if the challenged statements are literally false or literally true, but misleading. *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir.2002). A plaintiff attempting to establish the second kind of falsehood, that an advertisement is literally true but misleading, must "present evidence of deception" in the form of consumer surveys, market research, expert testimony, or other evidence. *Id.* Consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive. *See Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir.1992) ("[T]he success of a plaintiff's implied falsi-

ty claim usually turns on the persuasiveness of a consumer survey.").

At the pleading stage, AlphaMed is not required to submit this evidence. It is sufficient for AlphaMed to allege that the statements are deceptive. Nonetheless, because it does not have standing, AlphaMed has not stated claims for false advertising under the Lanham Act in Counts III and IV.

**D. *AlphaMed has stated a claim for tortious interference in Count VI.***

 Count VI alleges that Arriva interfered with AlphaMed's business relationship with Williams, AlphaMed's chief investor (¶ 124). According to the TAC, Arriva's officers met with FBI Agent James R. Conner, III ("Agent Conner") to encourage him to target AlphaMed's investors in an investigation of AlphaMed (¶ 125). Agent Conner acted as Arriva's agent and contacted Williams in order to convince him not to continue his business relationship with AlphaMed (¶¶ 126–129).

 To prevail on a tortious interference claim, a plaintiff must show: (1) the existence of a business relationship; (2) the defendant had knowledge of the relationship; (3) the defendant intentionally and unjustifiably interfered with the relationship; and (4) the plaintiff suffered damage as a result. *See Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1473 (11th Cir.1989); *Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985). Intentional interference requires both the intent to damage the business relationship and a lack of justification for doing so. *See Smith v. Emery Air Freight Corp.*, 512 So.2d 229, 230 (Fla. 3d DCA 1987) (citing *Landry v. Hornstein*, 462 So.2d 844 (Fla. 3d DCA 1985)). To be intentional, interference need not be motivated by the intent to secure a business advantage. It is enough for the interfer-

ence to have been motivated by malice; it need not have been motivated by greed. *See Ahern v. Boeing Co.,* 701 F.2d 142, 145 (11th Cir.1983); *Tamiami Trail Tours,* 463 So.2d at 1127–28. AlphaMed has alleged: (1) it had a business relationship with Williams; (2) Arriva had knowledge of the relationship; (3) Arriva acted with malice by *inducing* Williams not to continue his business relationship with AlphaMed; and (4) as a result, AlphaMed suffered economic damages.

Arriva argues that a tortious interference claim cannot be based on conduct that indirectly or consequentially interfered with the contractual or business relationship at issue. *See Ethyl Corp. v. Balter,* 386 So.2d 1220, 1224 (Fla. 3d DCA 1980) (no claim for interference with contract because the alleged interference was consequential and only indirectly caused the termination of the contract at issue). According to Arriva, AlphaMed's allegations are too attenuated to be sufficient. Arriva claims that an FBI agent's investigation of AlphaMed cannot be the basis for a tortious interference with contract claim. However, AlphaMed specifically alleges that Agent Conner was acting as the agent of Arriva and that Arriva specifically induced Agent Conner to contact Williams, AlphaMed's chief investor. Therefore, the allegations are sufficient to state a claim.

Arriva also argues that the communications made by Agent Conner were qualifiedly privileged because they were done in the course of the FBI's investigation into criminal activity. A statement "made by one who has a duty or interest in the subject matter to one who has a corresponding duty or interest" is qualifiedly privileged. *McCurdy v. Collis,* 508 So.2d 380, 382 (Fla. 1st DCA 1987). In order to assert a qualified privilege, the party seeking to assert it must prove: (1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to the purpose; (4) a proper occasion; and (5) publication in a proper manner. *See Axelrod v. Califano,* 357 So.2d 1048, 1051 (Fla. 1st DCA 1978) (setting forth the elements of a qualified privilege in the defamation context). A party's privilege to interfere with a business relationship is not qualified where the party purposefully interferes or acts egregiously against another party. *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1294 n. 9 (11th Cir.2001). A qualified privilege does not exist where the sole reason for interference in a contract is to do harm or for some other bad motive. *Id.*

AlphaMed has alleged that Arriva did not act in good faith and that Arriva had no interest with Williams to uphold. AlphaMed has alleged that Arriva's actions were done with malice. Therefore, it has stated a claim for tortious interference with business relationship and has alleged that Arriva's actions are not qualified.

**E. *AlphaMed has stated a claim for unfair competition in Count VII.***

In Count VII, AlphaMed alleges that Arriva engaged in common law unfair competition. To establish a claim for unfair competition, Florida law "requires that [plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion." *Donald Frederick Evans and Assoc. v. Continental Homes, Inc.,* 785 F.2d 897, 914 (11th Cir.1986). AlphaMed has alleged that Arriva's practices, including corporate espionage, advertising, and relations with investors, constitute deceptive conduct. AlphaMed further alleges that Arriva's claims that it will produce an AAT-derived pharmaceutical will lead to consumer confusion.

Arriva claims that the unfair competition count is preempted by Florida's Uniform Trade Secret Act (the "UTSA"), Fla. Stat.

§ 688.008, which bars civil claims based upon the misappropriation of trade secrets. Arriva does not otherwise challenge the sufficiency of Count VII. Section 688.008, Fla. Stat., provides:

(1) Except as provided in subsection (2), ss. 688.001–688.009 displace conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.

(2) This act does not affect:

(a) Contractual remedies, whether or not based upon misappropriation of a trade secret;

(b) Other civil remedies that are not based upon misappropriation of a trade secret; or

(c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

■■■ The UTSA preempts all claims based on misappropriation of trade secrets. *Allegiance Healthcare Corp. v. Coleman*, 232 F.Supp.2d 1329, 1335 (S.D.Fla.2002). In the context of applying the UTSA's preemption provision, the court in *Coulter Corp. v. Leinert*, 869 F.Supp. 732, 734 (E.D.Mo.1994) applied Florida law. In *Coulter*, the court considered the plaintiff's claims for unfair competition and accounting. That court noted the lack of Florida jurisprudence on the statute and interpreted the statute in light of the plain language. *Id.* After doing so, the court concluded that "the plain language clearly precludes common law claims based on a theory of misappropriation of trade secrets. Thus, the issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008." *Id.*

Following this rationale, the Court must consider whether AlphaMed's allegations of unfair competition are distinguishable from the allegations of trade secret misappropriation. *See Allegiance Healthcare Corp.*, 232 F.Supp.2d at 1336 (finding that the plaintiff's unfair competition claim based on defendant's use of plaintiff's trade secrets and confidential information and was therefore preempted by the UTSA). AlphaMed incorporates the same general allegations into Count VII (unfair competition) and Count V (theft of trade secrets), but AlphaMed does not incorporate the allegations of Count V into Count VII. In its general allegations, AlphaMed claims that Arriva engaged in corporate espionage, and the theft of trade secrets is included in those allegations. In Count VII, in addition to the general allegations, AlphaMed also incorporates paragraphs 122–130, the allegations dealing with Count VI, tortious interference with business relationships. There are no other specific allegations. Although there are common factual allegations in Counts V and VII, AlphaMed is correct that it does not specifically allege that the misappropriation of trade secrets forms the basis of the unfair competition claim. Therefore, the UTSA does not preempt AlphaMed's unfair competition claim, and AlphaMed has stated a claim for common law unfair competition.

## III. CONCLUSION

For the all the reasons stated above, it is

**ORDERED AND ADJUDGED** as follows:

(1) Defendant, Arriva Pharmaceuticals, Inc.'s Motion to Dismiss the Second Amended Complaint (**D.E.289**) is **GRANTED IN PART AND DENIED IN PART** as follows:

(a) **GRANTED** as to Counts I–IV. Counts I–IV are **DISMISSED WITHOUT PREJUDICE.**

(b) **DENIED** as to Counts VI and VII.

(2) Plaintiff, AlphaMed Pharmaceuticals, Inc. may file a Fourth Amended Complaint on or before **January 25, 2005.**

**DONE AND ORDERED.**