**PHOENIX OF BROWARD, INC. on behalf of itself and similarly situated Burger King Franchisees, Plaintiff,**

v.

**McDONALD's CORPORATION, Defendant.**

**Civil Action No. 1:06–CV–394–CAP.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 1, 2006.

Charna E. Sherman, David C. Weiner, Stephanie Niehaus, Squire Sanders & Dempsey, Cleveland, OH, Edward T. Kang, Marc J. Zucker, Oliver D. Griffin, Walter Weir, Jr., Weir & Partners, Philadelphia, PA, Irwin W. Stolz, Jr., Winburn, Lewis, Barrow & Stolz, Athens, GA, William P. Eiselstein, Miller & Martin, Atlanta, GA, James W. Hurt, Jr., Winburn Lewis & Stolz, Athens, GA, for Plaintiff.

David J. Doyle, George C. Lombardi, Winston & Strawn, Chicago, IL, Donald A. Loft, Morris Manning & Martin, Atlanta, GA, for Defendant.

## ORDER

PANNELL, District Judge.

This matter is before the court on the defendant's motion to dismiss [ Doc. No. 13].

### Factual Background

The plaintiff, Phoenix of Broward, Inc. ("Phoenix"), is a licensed Burger King franchisee operating a Burger King fast food restaurant in Ft. Lauderdale, Florida. Although not a party to this lawsuit, Burger King Corporation owns, operates, and franchises Burger King fast food restaurants throughout the world. There are approximately 11,000 Burger King restaurants worldwide.

Like Burger King, the defendant, McDonald's Corporation ("McDonald's"),

owns, operates, and franchises fast food restaurants throughout the world. There are approximately 30,000 McDonald's restaurants in 119 countries, of which approximately 13,000 are located in the United States.

McDonald's and Burger King are competitors in the fast food restaurant industry. Both companies use a variety of promotional strategies to attract customers, generate sales, and engender customer loyalty. For example, beginning in 1995 and continuing until 2001, McDonald's ran games, such as the "Monopoly Game at McDonald's," "Hatch, Match and Win," and "Who Wants to be a Millionaire Game." Each of these promotional games had low-value, mid-value, and high-value prizes. Low-value prizes included food items and low dollar cash prices. High-value prizes included vehicles and cash of up to $1 million. Generally, there were two opportunities to win the $1 million grand prize: (1) by obtaining the $1 million instant winner game piece, or (2) by collecting certain game pieces.

McDonald's extensively advertised and promoted each of the games it offered to the public. As part of its advertisements, McDonald's allegedly represented that all customers had a fair and equal opportunity to win all of the offered prizes, including the high-value prizes. McDonald's advertisements also listed the odds of winning specific prizes.

According to Phoenix's complaint, because customers desired the opportunity to win the promoted prizes, especially the high-value prizes, McDonald's promotional games produced a substantial amount of revenue over and above the normal revenue stream.

In approximately April 2000, the Federal Bureau of Investigation ("FBI") began investigating McDonald's promotional games. According to Phoenix, at some time before or while the games were underway, the FBI informed McDonald's that there were problems with the random distribution of McDonald's game pieces. Despite this alleged knowledge, McDonald's continued to advertise and promote its games as if all customers had an equal opportunity to win the high-value prizes.

In 2001, the United States Department of Justice and the FBI announced that since at least 1995, certain of McDonald's promotional games had been compromised by a criminal ring led by an individual employed by Simon Marketing, Inc. ("Simon"), the company McDonald's engaged to operate its promotional games. Specifically, between at least 1995 and August 2001, Simon's Director of Security, Jerome Jacobson, diverted at least $20 million in high-value prizes from McDonald's games by embezzling game pieces and distributing them to a network of "winners." When describing Jacobson's crime, the Attorney General of the United States stated, "[t]his fraud scheme denied McDonald's customers a fair and equal chance of winning."

On or about April 5, 2002, Jacobson pled guilty to charges of conspiracy and mail fraud. Approximately 45 other individuals also entered guilty pleas in connection with the conspiracy.

Upon disclosure by McDonald's to the public that certain of its promotions had been fixed, McDonald's created an independent task force to review all of its promotional procedures. McDonald's then introduced additional security procedures to ensure the integrity of future promotional games.

The disclosure of the fraud scheme also opened the floodgates to a wide variety of

civil litigation against McDonald's. Consumers filed several class-action lawsuits against McDonald's alleging consumer fraud, negligence, and unjust enrichment. On April 19, 2002, McDonald's settled these lawsuits by, among other things, agreeing to implement a $15 million instant giveaway, which provided the public with the opportunity to win 15 $1 million prizes.

The consumer lawsuits, however, did not end McDonald's woes. On February 22, 2006, Phoenix filed this action against McDonald's on behalf of itself and all similarly situated Burger King franchisees. The proposed class includes over 1,100 Burger King franchisees. The only claim for relief alleged by Phoenix is a false advertising claim brought pursuant to § 43(a) of the Lanham Act.

 Section 43(a) of the Lanham Act creates a "civil remedy for entities injured by their competitor's false or misleading advertising." *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F.Supp. 360, 364 (M.D.Fla.1996). The pertinent portion of the statute attributes liability to any person or entity who uses in commerce any false or misleading description of fact or false and misleading representation of fact which, in "commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services or commercial activities...." 15 U.S.C. § 1125(a)(1)(B). To succeed on its false advertising claim, Phoenix has the burden of showing that: (1) McDonald's advertisements are false or misleading; (2) the advertisements deceived, or had the

capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented advertisements affect interstate commerce; and (5) Phoenix has been or is likely to be injured as a result of the false advertising. *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir.2002).

In this case, Phoenix alleges that McDonald's advertisements stating that each player had a fair and equal chance to win the high-value prizes in the rigged games were false. In reality, many of the high-value prizes had been stolen by Jacobson's criminal ring. Phoenix claims that such advertising unlawfully diverted sales away from Burger King restaurants to McDonald's restaurants. Phoenix also alleges that McDonald's conduct was "intentional and/or sufficiently reckless" enough to subject McDonald's to treble damages.[1] For instance, Phoenix claims that McDonald's "knowingly and deliberately" continued to advertise that its games were fair after learning that the games were compromised.

As recompense for the "diversion of their customers," Phoenix asks the court to: (1) order McDonald's to disgorge an appropriate share of McDonald's profits associated with sales generated by the fixed promotional games, and (2) award the class their actual damages, treble damages, pre-judgment and post-judgment interest, and costs and expenses. Notably, Phoenix does not seek an injunction, presumably because the criminal activity causing the falsity of McDonald's advertisements ceased after the FBI and the

---

1. Although Phoenix claims that McDonald's conduct was intentional or reckless, nowhere in the complaint does Phoenix allege that McDonald's was involved in Jacobson's criminal plan, nor does Phoenix allege that McDonald's knew Jacobson was going to steal game pieces before he did.

Department of Justice concluded their investigation and Jacobson pled guilty.

On April 17, 2006, McDonald's filed the present motion to dismiss. McDonald's advances three arguments in support of its motion to dismiss. First, McDonald's argues that Phoenix lacks prudential standing to bring this lawsuit. Second, McDonald's asks the court to rule that the criminal conduct of Jacobson and his conspirators is an intervening cause that severs any possible liability on the part of McDonald's. Third, McDonald's claims that Phoenix's complaint should be dismissed because Phoenix failed to plead its Lanham Act claim with the specificity required by Federal Rule of Civil Procedure 9(b).

## Legal Analysis

### A. Standard of Review and Novelty of Phoenix's Claim

When considering a motion to dismiss, the court must accept the facts pleaded as true and construe them in a light favorable to the non-movant. *See Covad Communications Corp. v. BellSouth Corp.*, 299 F.3d 1272, 1279 (11th Cir.2002).

Before reaching McDonald's standing arguments, the court must address the parties' initial disagreement. The parties spend much of their briefs arguing about whether Phoenix's theory of liability is novel. For instance, McDonald's argues that "never before has a company brought a Lanham Act claim against a competitor whose advertising allegedly became 'false' or 'misleading' solely because of the felonious conduct of third parties." In response, Phoenix cites to *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081 (7th Cir.1994) and *Lubrizol Corp. v. Exxon Corp.*, Civil Action No. 91–CV1472 (N.D.Ohio) as examples of just such a complaint.

After reviewing the cases cited by the parties, the court concludes that both parties are partially correct. Phoenix is correct in the sense that companies have brought Lanham Act claims against competitors who argued that they acted in good faith when they generated the advertisement at issue. *See, e.g., Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958) (concluding that the fact that the name of a licensee's subsidiary appeared on a bread wrapper due to a mistake caused either by a third-party printer or the defendant was not a defense to a § 43(a) false designation of origin claim because there is no requirement that the falsification occur wilfully or with the intent to deceive); *American Rockwool, Inc. v. Owens–Corning Fiberglas Corp.*, 640 F.Supp. 1411, 1449 (E.D.N.C.1986) ("Plaintiff's contention that because it relied on a certified laboratory's test results in making its label representations, these representations cannot be false under the Lanham Act, is simply without merit. . . . This evidence could support a finding that the plaintiff reasonably should have known that its bag labels were false; again, there is no requirement under the Lanham Act of proof of specific knowledge of the falsity of the representation made."). For example, in *BASF*, 41 F.3d at 1081, Old World Trading Company advertised that its antifreeze met certain industry specifications. Old World did not, however, conduct its own testing. Instead, it contracted out its antifreeze blending and testing to a third party, Dearborn Chemical Company. BASF brought suit against Old World, claiming that Old World never actually tested its antifreeze to determine whether it met the specifications. Old World responded by stating that Dearborn's representatives assured Old World that the antifreeze formula met the specifications. Despite Old World's claims of good faith, the Seventh Circuit affirmed the district

court's holding that Old World was liable to BASF for false advertising.

■ The *BASF* case is consistent with the well-settled concept that no proof of intent or willfulness is required to establish a false advertising claim pursuant to § 43(a) of the Lanham Act. *See Vector Products, Inc. v. Hartford Fire Insurance Co.*, 397 F.3d 1316, 1319 (11th Cir.2005); *see also* 1A Louis Altman, CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:28 (4th ed. 2006) ("As a general rule, [ ] courts do not inquire into the good or bad faith of the advertiser, or the purpose of the advertisement, in passing upon its truth or falsity. The deceptive or misleading quality of the advertisement is not vitiated by the advertiser's good faith and, accordingly, intent to deceive is not an element of the violation. An innocent state of mind does not diminish the false advertiser's unfair advantage over competitors."); Lillian R. BeVier, *Competitor Suits for False Advertising Under Section 43(a) of the Lanham Act: A Puzzle in the Law of Deception*, 78 Va. L.Rev. 40–41 (1992) ("Under current interpretations of section 43(a), advertisers are strictly liable both for an express or implied claim's falsity and for the fact that it was made. Thus, the advertiser's intent or her negligence is in principle irrelevant in two quite different ways.... [A]s to the truth or falsity of the representation, it does not matter whether the advertiser believed it to be true, or even whether she had reasonable grounds for such a belief...."). Rather, as the Eleventh Circuit has held, § 43(a) creates a strict liability tort cause of action. *Vector*, 397 F.3d at 1319. Thus, the fact that McDonald's acted in good faith when it created the advertisements at issue is not a defense to Phoenix's action.

On the other hand, McDonald's is correct in that the court has been unable to locate any case where a company brought a Lanham Act claim against a competitor whose advertising became false or misleading due to the *felonious conduct* of *third* parties. Although arguably factually similar, *BASF* does not deal with allegedly felonious conduct. The *Lubrizol* case, moreover, does not have any published decisions, and the case was settled before final judgment.

## B. *Standing*

■ Turning to the standing issue, McDonald's first substantive argument is that Phoenix lacks prudential standing to bring its false advertising claim. The requirement of standing is both a constitutional limitation on federal court jurisdiction and a prudential limitation on its exercise. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The constitutional requirements for standing emanate from Article III of the United States Constitution, which states that federal courts may only adjudicate cases or controversies. *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Constitutional standing requires only that a plaintiff have suffered an injury in fact, that there be a causal connection between the injury and the defendant's conduct, and that the injury be redressable by a favorable court decision. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136.

■ In addition to the constitutional requirements, federal courts adhere to a second standing component that is based on prudential concerns. The goal of prudential standing, like constitutional standing, is to determine whether the plaintiff "is a proper party to invoke judicial resolution of the dispute and the exercise of the

court's remedial powers." *Bender v. Williamsport Area School District,* 475 U.S. 534, 546 n. 8, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986).

The Eleventh Circuit has not addressed what test the court should use in determining whether a plaintiff has prudential standing to bring a Lanham Act false advertising claim. Outside the Eleventh Circuit, courts have developed two tests to determine whether a plaintiff has prudential standing to assert a false advertising claim under the Lanham Act. The Seventh, Ninth, and Tenth Circuits appear to have adopted a categorical approach, holding that to have standing to assert a Lanham Act false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury. *See Stanfield v. Osborne Industries, Inc.,* 52 F.3d 867, 873 (10th Cir.1995); *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561, 575 (7th Cir.1993); *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir.1992). On the other hand, the Third and Fifth Circuits have adopted a less categorical multi-factor test, based on the Supreme Court's test for antitrust standing, that focuses judicial enforcement of the Lanham Act on the protection of commercial interests and the prevention of competitive harm. *See Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 233–35 (3d Cir.1998); *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539, 562–64 (5th Cir.2001). Under the *Conte Bros.* test, five factors are relevant to the prudential standing analysis: "(1) the nature of the plaintiff's alleged injury, (2) the directness or indirectness of the asserted injury, (3) the proximity or remoteness of the party to the alleged injurious conduct, (4) the speculativeness of the damages claim, and (5) the risk of duplicative damages or complexity in apportioning damages." *Id.* at 563.

██ After a survey of the caselaw in other circuits, the court finds the test set forth in *Conte Bros.,* 165 F.3d at 233–35, persuasive. *Cf. Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.,* 391 F.Supp.2d 1148, 1161 (S.D.Fla. 2005) (using the *Conte Bros.* test to determine whether a biopharmaceutical company had standing to sue an alleged competitor for false advertising in violation of the Lanham Act). The *Conte Bros.* test provides the court with appropriate flexibility to address factually disparate scenarios, while at the same time supplying a principled means for addressing standing under the false advertising prong of § 43(a). Thus, the court will next address each factor of the *Conte Bros.* test separately.

1. *Whether Phoenix's Injury is the Type of Injury Congress Sought to Redress in the Lanham Act*

██ The first *Conte Bros.* factor directs the court to decide whether the "alleged injury is of a type Congress sought to redress in providing a private remedy for violations of the Lanham Act." *Procter & Gamble,* 242 F.3d at 563. The Lanham Act has two aims: (1) vindicating commercial interests that have been harmed by a competitor's false advertising, and (2) securing to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not. *Conte Bros.,* 165 F.3d at 234.

██ While the court doubts that Congress sought to redress advertising rendered false by the criminal conduct of

third parties,[2] the court concludes that this factor weighs in favor of a finding of standing. McDonald's and Phoenix are unquestionably competitors in the fast food industry. Also, as noted above, the Eleventh Circuit has described false advertising claims as "strict liability tort[s]." *Vector*, 397 F.3d at 1319. Accordingly, McDonald's good faith does not immunize it from liability, nor does it transform Phoenix's claim from the type of claim the Lanham Act was designed to prevent.

Although this factor weighs in favor of standing, the court concludes that it does so only weakly. The advertisements at issue did not tout McDonald's products or services, nor did they disparage the products or services of Burger King. Instead, the advertisements focused on the odds of winning certain high-value prizes in various promotional games. There is no indication that Burger King's good will or reputation was harmed directly or indirectly by the allegedly false advertisements. As seems apparent from the spate of consumer lawsuits against McDonald's, if there has been any harm caused by Jacobson's criminal conduct, it has been McDonald's reputation that has ultimately suffered, not Burger King's.

In support of its argument that this factor is practically dispositive of the standing issue, Phoenix makes much of the fact that the advertisements at issue were literally false. For instance, Phoenix claims that a competitor who engages in literally false advertising moves directly to a damages defense. The court, however, fails to see how this changes the court's conclusion that this factor weighs only weakly in favor of standing. First, it is not true that a competitor whose advertisements are literally false only has a damages defense. The Eleventh Circuit has held that a plaintiff must still prove that the advertising was material to customers. *Johnson & Johnson*, 299 F.3d at 1250. Second, the alleged literal falsity of McDonald's advertisements does not change the fact that the injury to Phoenix's commercial interests caused by the advertisements can hardly be described as typical. Again, as noted above, McDonald's advertisements did not tout McDonald's products or services or disparage Burger King's products or services. Any effect, therefore, on Burger King's good will or reputation is absent or, at the very least, attenuated.

## 2. The Directness of Phoenix's Injury

■ The second *Conte Bros.* factor looks at whether the defendant's conduct has had a direct effect on either the plaintiff or the market in which the parties participate. *Joint Stock Society v. UDV North America*, 266 F.3d 164, 181 (3d Cir. 2001). Phoenix describes its alleged direct injury as stemming from the fact that McDonald's misrepresented the odds of winning a few, but not all, of its prizes in certain promotional games and that this misrepresentation led to an "unnatural spike" in McDonald's profits. Phoenix then argues that customers would have eaten at Burger King, instead of McDonald's, had they known that a few of the high-value prizes in particular games were unavailable, even though all of the other

---

**2.** Phoenix does not allege that any employee of McDonald's was involved in Jacobson's criminal ring. At most, Phoenix claims that McDonald's continued to advertise that the rigged games were fair after it received notice from the FBI that it was investigating the possibility that the games were rigged. Phoenix also suggests that McDonald's security before learning of Jacobson's criminal activity was lax.

prizes could be won. Even taking Phoenix's allegation that there is a causal connection between the two facts as true, it still requires Phoenix to prove a complex causal chain. Given the length and complexity of the causal links leading to Phoenix's "direct" injury, the court concludes that this factor weighs only moderately in favor of prudential standing.

### 3. *Proximity of Phoenix to the Allegedly Injurious Conduct*

■ The third factor requires the court to determine whether there is an identifiable class of persons whose "self-interest would normally motivate them to vindicate the public interest," thus diminishing the "justification for allowing a more remote party ... to perform the offices of a private attorney general." *Joint Stock Society,* 266 F.3d at 182. The court construes the third factor as looking at whether there is an identifiable group that is better suited to vindicate the public interest, not at whether there is a better group to sue for false advertising under the Lanham Act. The court concludes that there is.

■ In this case, the harm caused by McDonald's allegedly false advertisements more directly affects the customers who were denied the opportunity to compete for the few high-value prizes criminally co-opted by Jacobson. While these customers do not have standing to sue under the Lanham Act, they could and did vindicate the public interest by suing McDonald's for fraud. Thus, there is no need to empower Phoenix to act as a private attorney general in this case.

### 4. *Speculativeness of the Damages*

■ The fourth factor, the speculativeness of the damages, weighs heavily against standing. It is undisputed that only a few of the high-value prizes in each game were affected by Jacobson' s criminal behavior. It is also undisputed that the low-value and mid-value prizes were unaffected by Jacobson's conduct and that McDonald's gave away millions of prizes in its contests. Phoenix, nevertheless, argues that some identifiable segment of the public that was planning on going to Burger King opted instead to go to McDonald's solely because it was seeking to win a high-level prize in one of McDonald's games.

Given the number of fast food competitors of McDonald's, as well as the difficulty in determining what percentage of customers would have gone to Burger King, and not some other restaurant, but for McDonald's allegedly false advertisements, it is hard to see how any damages awarded would not be highly speculative. Further, the fact that the promotional games took place over a period of several years in many geographic markets throughout the world also increases the speculativeness of the damages. Finally, the notion that Phoenix will be able to prove that some ascertainable number of customers visited McDonald' s for the specific purpose of winning one of the few high-value prizes that were affected by Jacobson's criminal behavior and cared nothing for the low-value and mid-value prizes is difficult to imagine.

### 5. *Risk of Duplicative Damages*

■ The fifth and final *Conte Bros.* factor asks the court to assess the risk of duplicative damages and the complexity of apportioning damages. Like the previous factor, this factor weighs heavily against standing. If the court were to find that Phoenix has standing to sue McDonald's over advertising that was rendered false by the criminal conduct of a third party concerning a promotional game, as op-

posed to McDonald's or Burger King's goods or services, it could engender copycat suits by each and every one of McDonald's competitors. Because damages are so speculative, the risk of broad and overlapping damages caused by these lawsuits is great. There is also a great risk that Phoenix's lawsuit will create an administratively complex damages proceeding.

Allowing prudential standing, moreover, would result in a great increase in litigation. If every fast food competitor had a cause of action for false advertising regardless of the speculativeness of the damages, regardless of any impact on the competitor's good will or reputation, and regardless of the remote nature of the injury suffered, the impact on federal courts would be significant.

6. *Weighing the Totality of the Conte Bros. Factors*

 In sum, the first two factors weigh moderately or weakly in favor of standing, while the remaining three factors weigh against prudential standing. Although it is true that Phoenix is a direct competitor of McDonald's, under the *Conte Bros.* test, standing does not turn on the label placed on the relationship between the parties. *Conte Bros.*, 165 F.3d at 235. Given the existence of more directly injured parties, the tenuousness and sheer speculativeness of Phoenix's damages claim, and the possibility of multiple duplicative recoveries, the court concludes that Phoenix does not have prudential standing to bring a § 43(a) false advertising claim against McDonald's.

C. *Whether Jacobson's Theft is an Intervening Cause that Severs McDonald's Liablity and Whether Phoenix Failed to Comply with Rule 9(b)'s Heightened Pleading Requirements*

Because the court concludes that Phoenix lacks prudential standing to assert a false advertising claim against McDonald's, there is no need for the court to address McDonald's remaining arguments in support of dismissal.

*Conclusion*

For the foregoing reasons, McDonald's motion to dismiss [Doc. No. 13] is GRANTED to the extent that the court concludes that Phoenix lacks prudential standing to bring its false advertising claim against McDonald' s. Because Phoenix's false advertising claim is the only claim asserted by Phoenix, this action is DISMISSED WITH PREJUDICE and the clerk is DIRECTED to close the file.